**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SHAWN SMITH

      Plaintiff,

          vs.                           Case No.

CHICAGO POLICE DETECTIVE ANTHONY REYES
CHICAGO POLICE SERGEANT JASON BROWN
CHICAGO POLICE SERGEANT BRIAN RONEY

CITY OF CHICAGO,

      Defendants.                  JURY TRIAL DEMANDED

## <u>COMPLAINT</u>

      NOW COMES the Plaintiff, SHAWN SMITH, by and through his attorneys  Stephen

L. Richards and Joshua S.M. Richards, and makes the following complaint against Defendants

Chicago Police Detective Anthony Reyes, Chicago Police Sergeant Jason Brown, and Chicago

Police Sergeant Brian Roney, and the City of Chicago

and states as follows:

### JURISDICTION

1.  This action is brought pursuant to 42 U.S.C. Sec. 1983 to redress the deprivation of law

    of Shawn Smith's  civil rights as secured by the United States Constitution.

2.  This court has jurisdiction of the action pursuant to 28 U.S.C. Secs. 1331, 1343, 1367.

## VENUE

3. Venue is proper under 28 U.S.C. Sec. 1391(b).

## PARTIES

4. Plaintiff Shawn Smith is a male person who is a United States Citizen and a resident of Cook County, Illinois.

5. Defendant Anthony Reyes is and at all times relevant to this suit a detective in the Chicago Police Department. His star number is 20343. He is sued in his individual capacity.

6. Defendant Jason Brown is and at all times relevant to this suit a sergeant in the Chicago Police Department. His star number is 14652. He is sued in his individual capacity.

7. Defendant Brian Roney is and at all times relevant to this suit a sergeant in the Chicago Police Department. His star number is 2244. He is sued in his individual capacity. He is sued in his individual capacity.

8. Defendant City of Chicago is a Municipal Corporation, organized pursuant to the laws of the State of Illinois.

## FACTUAL ALLEGATIONS

### *Procedural History*

9. On July 22, 2010, plaintiff Shawn Smith was arrested by defendants Brian Roney and Jason Brown, acting in concert with defendant Anthony Reyes.

10. Shawn Smith was charged with armed robbery and aggravated battery with a firearm.

11. Shawn Smith filed a motion to quash arrest and suppress evidence, which was denied by the circuit court.

12. On May 23, 2014, Shawn Smith was convicted after a jury trial of these charges and sentenced to consecutive terms of 26 years and 20 years in prison on the case.

13. On December 27, 2017, the appellate court remanded Shawn Smith's case to the circuit court for a appointment of new counsel and a new suppression hearing and retained jurisdiction. *People v. Smith*, 2017 IL App (1st) 141814-UB, ¶¶ 101-04. (See Exhibit One).

14. Following the remand, Shawn Smith filed an amended motion to quash arrest and suppress evidence.

15. On July 19, 2019, the circuit court issued an agreed order granting the amended motion, vacating Shawn Smith's convictions, and dismissing the charges against him.

16. Shawn Smith served 3291 days in prison, or nine years and seven days.

17. Shawn Smith was release from prison on August 9, 2019.

*Facts of the Crime Charged*

The Prosecution Case

18. Carl Morrison testified.

19. In 2010, Morrison worked at Barney's Pizza, located at Chicago and Parkside as a delivery driver.

20. The procedure for deliveries was that Morrison would get a receipt which would show the customer's name, address and phone number. The driver would get a copy, and the restaurant would keep a copy. (12/17/2013, 57). Morrison identified People's Exhibit No. 6 as the receipt. The number which placed the order was 773-981-5292.

21.  On July 8, 2010, at around 5:20 p.m., Morrison received an assignment for a delivery at 310 north Long.

22.  Morrison drove to that address, which he described as an apartment building.

23.  No one appeared at first. Morrison called the number on the receipt, and a man answered the phone and said that he was coming out.

24.  When the man did not come out, Morrison called a second time. Morrison heard the phone ringing inside 310 north Long and saw a young man on the phone in the house.

25.  The person came out of the house. He identified the man who came out as Shawn Smith.

26.  Morrison asked the person if he wanted the order. The person replied yes and asked how much was it. Morrison went around to the back passenger door.

27.  The robber pointed a gun at Morrison's chest. It almost touched his chest, but Morrison pushed it down.  As Morrison pushed the gun down, it went off in his stomach.

28.  The robber went in Morrison's pocket, and took out a stack of bills. The gun was a small black revolver.

29.  As the robber walked away, Morrison got into his car and drove to the hospital.

30.  The encounter with the robbery lasted only seconds.

31.  At the hospital, Morrison was treated for his gunshot wound and told some officers what had happened.

32.  Morrison described the robber as a black male, with light skin, low hair cut, meaning a "bald fade," about 5 foot seven or eight, about 130 or 140 pounds wearing a green T-shirt and blue jeans.

33. Morrison had to have surgery to repair damage to his colon, rectum, and bladder.

34. On July 22, 2010, Morrison identified Shawn Smith in a lineup.

35. Morrison had two convictions for burglary and one conviction for possession of a stolen motor vehicle.

36. Chung Don testified as an other crimes witness.

37. He worked at the See-Thru Kitchen, a Chinese restaurant, on Kedzie Drive in Chicago as a delivery driver.

38. The procedure for filling a delivery order is that he would receive a receipt with the phone number and an address, and a copy of the receipt would stay at the restaurant.

39. On July 7, 2010, at 5:30 p.m., Don was working at the restaurant and received a delivery order for the address of 310 north Long in Chicago, Cook County.

40. He drove to that address, which was a two story single house, parked, and called for the customer to come out, using the phone number on the receipt.

41. Two men came of the house. One walked to the driver's side of Don's car, and the other went to the passenger side. The man on the passenger side, pointed a gun at Don, and played with the hammer.

42. The man who pointed the gun was a light skinned African American.

43. The gun was a small black handgun, which appeared to be a revolver.

44. The man demanded money from Don, and Don gave the man all of the money he had earned that day.

45. Don identified Shawn Smith in open court as the man who pointed a gun at him and robbed him.

46. After Don had given the man the money, the man asked for Don's wallet.

47. Don replied that he did not have a wallet – that he had given the man all of his money.

48. The entire encounter lasted a minute or two.

49. After Don was robbed he drove back to the restaurant, talked to his boss and called his police.

50. The next day, Don spoke with a police officer who came to the restaurant.

51. The conversation was facilitated by another employee who acted as interpreter. Don gave the officer the receipt for the order. Don identified the receipt, People's Exhibit No. 1. The phone number on the receipt was 981-5292. The phone number for the See-Thru Chinese Kitchen was 773-836-0488.

52. On July 22, 2010, Don viewed a lineup and identified Shawn Smith as the robber.

53. Before viewing the lineup, the police told him that they had a suspect in custody, and he expected to see the person who robbed him.

54. Don described the man who had robbed him as a young black man, medium size, not too tall, not too short, "light color scheme."

55. He did not remember telling the police that the man was 5 foot six inches tall or that he had braids. He did remember telling the police that the person weighed about 140 pounds.

56. Don denied telling the officers that the man had yellow skin. He claimed that he told them the man had "light color skin."

57. Don also denied telling the officers that the man had "very light" skin or that the man was biracial.

*Shawn Smith's Defense At Trial*

58. Shawn Smith testified.

59. On July 7 and July 8, 2010, Shawn Smith was living at 30 South 21st Avenue in Maywood, Illinois with his father, Charles Johnson. He was working at McDonald's at Madison and Karlov as the overnight manager.

60. On July 7, 2010, Shawn got off work and went to the house of his aunt, Christine Smith, at 5837 south Washington.

61. After taking the bus, he arrived at around 6:45 a.m., and was let in by his brother, Michael Smith. His aunt and uncle were not home. His mother, who was deceased at the time of the trial was also there as were his three cousins, who nine, four, and three years old.

62. After he arrived, Shawn  took his oldest cousin, Tanisha Smith, to her school, arriving back home at around 10:00 a.m.

63. Shawn went to sleep, and woke at 8:00 p.m. to go to work.

64. Shawn did not rob Don Chung on July 7, 2010, and was nowhere near 310 north Long.

65. Shawn Smith last wore his hair in dreads in 2007.

66. On July 22, 2010, Shawn went to a class. The class let out at 2:00 p.m. and immediately after class Shawn was stopped and detained by Chicago police officers.

67. Shawn had had the phone found on his person for about a week.

68. Shawn bought the phone on a Sunday or a Monday, July 11 or July 12, 2010. He went to a phone store at Laramie and Lake. They did not have the phone he wanted.

69. After Shawn left that store, he ran into James Williams, a man he had gone to high school with.

70. Shawn met Williams as he was walking to Central to go to another phone store on Central and Lake. He met Williams at Long and Lake.

71. Shawn chatted with Williams and mentioned to him that he was trying to replace a phone he had lost on the bus.

72. Williams offered to sell Shawn, Williams's phone for $20. Shawn bought the phone. Williams told Shawn the phone was a prepaid phone which lasts for a certain amount of time and must be reactivated by paying a bill after that time.

73. James Williams is about 150 pounds in weight, with a lighter complexion than Shawn Smith, and wearing braids.

74. Officer Alan Rogers testified.

75. He was present when Don Chung gave his description of the robber through an interpreter.

76. Chung said that the robber was light in complexion and could have been bi- racial.

77. Police officer Jesus Vasquez testified.

78. He interviewed Carl Morrison at the hospital. Morrison never mentioned anything about the robber's hair.

*Defendants' False Statements About "Pen-Registers"*

79. At a pretrial hearing on Shawn Smith's motion to quash and suppress, defendant Anthony Reyes testified.

80. Defendant Reyes testified that in June and July 2010, he was assigned to investigate a string of armed robberies that had occurred on June 1, June 11, July 7 and July 8, of that year.

81. According to Reyes, the four armed robberies had two things in common, a telephone number and the description of the offender.

82. With respect to the telephone number, all four offenses involved an offender telephoning a restaurant to order food, from telephone number: 773-981-5292.

83. Once the food was delivered the delivery driver was robbed at gunpoint for food and money, with the last robbery escalating as a result of a struggle and the victim being shot in the stomach.

84. With respect to the offender, the descriptions given were of a male African American somewhere between 5' 5" and 5' 8" tall, and "approximately 17 to early 20s, 23 years old."

85. Reyes testified that as part of his investigation into these armed robberies he drafted an affidavit for an order that would allow the Organized Crime Division to follow up with a "pinging system" that allows them to "track this phone."

86. Reyes acknowledged that in drafting his affidavit he included the facts of each case, noted that the same phone number was used, and included the physical description of the offender.

87. According to Reyes, the affidavit was reviewed by the Assistant State's Attorney's Office, and then a judge determined that it was "sufficient to go forward and approved it."

88. The judge's order was allegedly signed on July 12, 2010.

89. The parties stipulated that the pin register number for that order and application was 2010 PR 098.

90. Reyes testified that after this order was signed, it allowed the Chicago Police Department to "go up on a pen register, specifically trap and trace devices on telephone number 773-981- 5292."

91. The alleged order was not admitted at the hearing on the motion to suppress or at trial, nor was it made part of the record on appeal, despite a promise by the prosecution that the record would be supplemented by a file stamped copy of the order. *People v. Smith*, 2017 IL App (1st) 141814, ¶¶ 96.

92. On cross-examination, Reyes acknowledged that apart from the aforementioned general description of the offender and the phone number, he had no other information that would lead to the particular arrest in this case.

93. At the same motion, defendant Jason Brown testified that in 2010 he was assigned to the Gang Investigation Section of the Organized Crime Division.

94. Brown testified that in his capacity as an officer in this division, he was familiar with the use of pen register and trap and trace devices.

95. Brown explained that "generally speaking" a pen register and trap and trace device, is a "method by which" the police are able to "monitor activity to and from cellular phones."

96. Brown averred that "depending upon the wording within the order," the police are permitted "different capabilities."

97. Brown testified that on July 22, 2010, he was assigned to a separate and unrelated federal wire investigation.

98. Brown was, however, familiar with defendant Brian Roney who was not on his team, but was involved with an armed robbery investigation.

99. According to Defendant Brown, Defendant Roney was monitoring the pen register and trap and trace device related to phone number 773-981-5292, which was the subject of that armed robbery.

100.     When asked how defendant Roney was monitoring that cell phone, defendant Brown explained "there is a device that we utilize or I should say our tech service people utilize in order to track cellular phone[s] whereby they're able to determine the exact location and proximity to the device."

101.     Brown further explained that the "apparatus is quite large" and does not "just fit in a handbag necessarily," and that therefore defendant Roney had to drive a large SUV to monitor the cell phone in question.

102.     Brown testified that he has been in that SUV before and was familiar with the "device" that was used.

103.     Brown further explained that "assuming different variables come together," when tracking a particular phone number, the police may be able to get a precise location of an individual with the cell phone associated with that number.

104.     Brown testified that "you need to know the exact region, specifically cell tower that the cellular phone is communicating with," and that "once that is able to be determined, you can then start narrowing your search," and at some point using the "device," obtain a precise location.

105.     Brown explained:

"The way the system works, it only gives you a two dimensional view of the world. So if somebody is in, let's say, a high-rise ***, you might be able to narrow the phone to

that specific building. But you wouldn't be able to determine the exact floor without using a secondary device." (Emphasis added.)

106.     Brown further testified that at around 2 p.m. he was exiting the U.S. Attorney's Office at 219 South Dearborn Avenue when he received a radio call for assistance from defendant Roney.

107.     Defendant Brown testified he spoke to defendant Roney who gave him a "very detailed" description of an individual he wanted stopped.

108.     When asked to provide that description, defendant Brown, however, stated that he could not recall it "at all," except that it was "very specific."

109.     After speaking with defendant Roney, defendant Brown proceeded to the general location of Wabash and Roosevelt Avenues.

110.     At 1210 South Wabash Avenue, the defendant Brown observed an individual matching the description provided by defendant  Roney walking alone on the street.

111.     Brown identified Shawn Smith in court as the individual that he observed. Defendant Brown exited his squad car and along with defendant Roney, who had by then "brok[en] his surveillance location," placed the Shawn Smith into custody.

112.     Brown testified that once Shawn Smith was placed into custody, he was searched and a cell phone with number 773-981-5292 was recovered from his person.

113.     In addition, Brown testified Smith  had "a misdemeanor amount of cannabis on his person."

114.      On cross-examination, defendant Brown acknowledged that he did not know from where defendant Roney used the "pen register," monitoring the signals from the

phone he was tracking, to precisely locate the defendant, or how close he was to the defendant when he sent his dispatch.

115.    On cross-examination, defendant Brown further admitted that he could not recall: (1) Shawn Smith's description; (2) whether the Shawn Smith was walking down the street alone or with other individuals; or (3) from which street or corner he initially identified Shawn Smith as the offender based on defendant Roney's description.

116.    On cross-examination, defendant Brown further admitted that prior to detaining the defendant he only knew that defendant Roney was involved in the monitoring of a pen register related to an armed robbery investigation, but above and beyond that he had no information about defendant Roney's investigation and that any other information that he testified to at the hearing, he had learned from defendant Roney after the arrest.

117.    Defendant Roney testified that On June 22, 2010, he was a technician in the Organized Crime Division of the Chicago police, and as such was familiar with pen registers.

118.    Roney stated that a "pen register is monitoring of inbound and outbound traffic on a telephone."

119.    Defendant Roney testified that after he received a "court order for a pen register," on July 22, 2010, he proceeded to monitor telephone number 773-981-5259, as part of an investigation into a string of armed robberies.

120.    Roney claimed that the pen register allowed him to watch "on a computer the activity of the cellular device of all calls coming in, all calls going out."

121.     Roney stated that he initially did this from his office at a police station, but eventually "went out in the field and furthered along the investigation."

122.     Roney claimed he drove a large unmarked SUV, which contained a laptop that allowed him access to the "pen register."

123.     Roney claimed he was able to watch all the calls coming in and going out, based on which he testified "there was specific information coming in saying that the phone was being used in that area."

124.     Roney claimed he drove to the vicinity of Wabash Avenue and 15th Avenue, whereupon after driving around for a bit, the information that he was "monitoring" on the laptop informed him that the cell phone was nearby.

125.     Roney claimed he gradually moved northbound on Wabash Avenue towards Roosevelt Avenue, until he "made a determination of seeing who [he] believed was in possession of the cell phone."

126.     Roney identified Shawn Smith  in court as that individual.

127.     Roney stated that he had a general description of the offender, as a male African American, "late teens, early 20s and about 5'6', 5'7 something like that."

128.     Roney claimed that as he was watching the pen register he saw the subject put his hand-held device to his head.

129.     Roney  claimed that he concluded that the cellular activity he was monitoring on his laptop was related to "the defendant reacting to answering or placing a phone call."

130.     Roney claimed that once he made that observation, he radio dispatched for assistance.

131.    Roney claimed that after Brown responded, Roney described what the subject was wearing.

132.    As they communicated over the radio  Roney claimed that he clarified which person he was talking about.

133.    Brown and Roney  met at the 1200 block of Wabash Avenue and approached and arrested Shawn Smith.

134.    A cell phone matching the number tracked by  Roney was recovered from Shawn Smith's person.

135.    On cross-examination, Roney was asked to explain how once he was in the area of Wabash Avenue and 15th Avenue, he knew that the telephone number he was searching for was nearby, and he responded:  "Based on the signal strength of the telephone the tower that it was hitting off of some other specific stuff just that the phone is the way the phone transmits."

136.    Roney further explained that once he parked, the signal strength in the "pen register" was getting weaker, and as he began moving his vehicle north on Wabash Avenue, the signal got stronger.

137.    When asked how he was able to narrow the signal to one particular person, Roney stated by the "strength of the telephone and signal that it emits."

138.    Roney  added that based on this he could tell what side of the street the person was on, and "to some point" that the person had crossed the street.

139.    Roney, however, could not recall how many other persons were crossing the street, or how many other individuals may have been directly in the vicinity of Shawn Smith  at that time.

140. On cross-examination, defendant Roney was asked whether he had any weight description of the perpetrator before he made an arrest, and he stated that "he might have."

141. After hearing all the testimony, the trial court denied the defendant's motion to quash arrest.

142. At trial, Reyes again testified to his efforts in obtaining the pen register and trap and trace order.

143. Reyes also testified that the pen register and trap and trace allow the police to use their technological equipment to bounce or ping satellite towers in order to pinpoint the location for a particular phone.

144. Reyes admitted, however, that his job entailed only applying for a pen register and trap and trace order and that he did not have the "technical wherewithal" to use the technology to find a particular phone.

145. Reyes explained that the Organized Crime Division was responsible for such efforts.

146. Roney next testified consistently with his testimony at the motion to quash hearing as to how he used the pen register and track and trace device to locate the Shawn Smith.

147. Roney testified that a "pen register" is also known as a "trap and trace," and that it is a device that monitors inbound and outbound calls on telephones.

148. Roney stated: "The purpose is to see numbers being dialed by a phone and numbers being dialed to that phone and possibly where the phone is at."

149.     Neither Roney, nor Reyes was qualified to testify as an expert concerning cell phone surveillance technology.

*The Appellate Court Opinion*

150.     The appellate court reversed on the ground that Shawn Smith's defense counsel was ineffective for failing to object to the admission of the testimony of defendants Reyes, Brown, and Roney. *People v. Smith*, 2017 IL App (1st)  141814,  ¶¶ 86-94.

151.     The court concluded that the device misleadingly described by defendants as a " pen register" was in fact a much more complex and sophisticated device known as a "Stinigray." *People v. Smith*, 2017 IL App (1st)  141814,  ¶¶ 65-69.

152.     The court further concluded that the no foundation was laid for the admission of the testimony of defendants Reyes, Brown, and Roney at the motion to suppress because there was no testimony that they were qualified as experts  or that there was a valid scientific or technical basis for their opinions. *People v. Smith*, 2017 IL App (1st)  141814,  ¶¶ 86, 89

153.     The appellate court also found that there was no testimony that the supposed "pen register," which could only in reality have been a "Stingray, " was working properly, or had been properly calibrated or tested. *People v. Smith*, 2017 IL App (1st)  141814,  ¶¶ 87, 88, 89.

154.     The appellate court characterized the testimony of the defendants as to the surveillance technology was "sparse, vague, obfuscating and incoherent." *People v. Smith*, 2017 IL App (1st)  141814,  ¶¶ 90.

155.     The appellate court specifically identified as "sparse, vague, obfuscating and incoherent,"  Reyes's  testimony that he drafted on order to allow the police to operate a

"'pinging system'" that would permit them to 'track this phone,' and that once granted

this order permitted the police to ,go up on a pen register, specifically trap and trace

devices on [the] telephone number." *People v. Smith*, 2017 IL App (1ˢᵗ) 141814, ¶¶ 90.

156.    The appellate court also specifically identified as "sparse, vague, obfuscating

and incoherent," Brown's testimony that: (1) he was familiar with the "pen register

device used by Roney, (2) that the apparatus was inside a large SUV because it was

"quite large" and did not "just fit in a handbag necessarily" (3) that a "pen register" was

a "method by which" the police were able to "monitor activity to and from cellular

phones," and which, "assuming different variables c[a]me together," "might" provide

the police with the precise location of a targeted cell phone number, and (4) that to use

the device the operating officer needed to know the exact region (cell tower) that the

cell phone was communicating with, so as to start narrowing the search and at some

point get a precise location. *People v. Smith*, 2017 IL App (1ˢᵗ) 141814, ¶ 91.

157.    The appellate court also specifically identified as "sparse, vague, obfuscating

and incoherent," as well as "elusive" defendant Roney's failure to explain how "pen

register" technology permitted him to locate a phone's precise location, in addition to

his nebulous testimony that as he used the device while driving around there was

"specific information coming in saying that the phone was being used in that area," and

his explanation that the information was based on "the signal strength of the telephone

the tower that it was hitting off of some other specific stuff just that the phone is the

way the phone transmits." *People v. Smith*, 2017 IL App (1ˢᵗ) 141814, ¶ 92.

158.    The appellate court therefore remanded for the case to the circuit court for: (1)

appointment of new counsel; (2) an opportunity to file an amended motion to quash

arrest and suppress evidence, if newly appointed counsel so desires; and (3) a new

hearing and resolution on the original/amended motion to quash arrest and suppress

evidence." *People v. Smith*, 2017 Ill. App. 141814, ¶ 104.

159.    On remand, an amended motion to quash and suppress was filed by new

counsel, but no hearing was ever held and the prosecution agreed to dismiss the case.

## COUNT 1 – DENIAL OF FOURTEENTH DUE PROCESS BY DEFENDANT REYES BY MAKING FALE STATEMENTS AND FABRICATING EVIDENCE

160.    Shawn Smith  realleges all previous paragraphs and incorporate them into this

count by reference.

161.    As detailed above, defendant Reyes deprived Shawn Smith of due process by

making false police reports, making false statements to prosecutors and by testifying

falsely at pretrial hearings and trial as to whether the apparent use of a "Stingray"

testify was authorized under an order allowing use of a "pen register," whether should

an order actually existed, how the supposed pen register operated, whether and/or how

Shawn Smith was located holding a phone used in the charged armed robbery by use of

the pen register and by falsely representing an apparent Stingray to be a pen register.

162.    These actions deprived Shawn Smith of due process.

**WHEREFORE** , Shawn Smith  asks  this court for damages according to proof and

for such other and further relief as this Court deems just.

**COUNT II – DENIAL OF FOURTEENTH DUE PROCESS BY DEFENDANT BROWN BY MAKING FALE STATEMENTS AND FABRICATING EVIDENCE**

163.     Shawn Smith realleges all previous paragraphs and incorporate them into this count by reference.

164.     As detailed above, defendant Brown deprived Shawn Smith of due process by making false police reports, making false statements to prosecutors and by testifying falsely at pretrial hearings and trial as to whether the apparent use of a "Stingray" testify was authorized under an order allowing use of a "pen register," by falsely whether should an order actually existed, how the supposed pen register operated, whether Shawn Smith was located holding a phone used in the charged armed robbery by use of the pen register and by falsely representing an apparent Stingray to be a pen register.

165.     These actions deprived Shawn Smith of due process.

WHEREFORE , Shawn Smith  asks  this court for damages according to proof and for such other and further relief as this Court deems just.

**COUNT III – DENIAL OF FOURTEENTH DUE PROCESS BY DEFENDANT RONEY BY MAKING FALE STATEMENTS AND FABRICATING EVIDENCE**

166.     Shawm Smith realleges all previous paragraphs and incorporate them into this count by reference.

167.     As detailed above, defendant Roney  deprived Shawn Smith of due process by making false police reports, making false statements to prosecutors and by testifying falsely at pretrial hearings and trial as to whether the apparent use of a "Stingray" testify was authorized under an order allowing use of a "pen register," by falsely

whether should an order actually existed, how the supposed pen register operated, whether Shawn Smith was located holding a phone used in the charged armed robbery by use of the pen register and by falsely representing an apparent Stingray to be a pen register.

168.     These actions deprived Shawn Smith of due process.

WHEREFORE , Shawn Smith  asks  this court for damages according to proof and for such other and further relief as this Court deems just.

## COUNT IV – MONELL CLAIM

169.     The defendants' use of a stingray was done pursuant to a pattern and practice of defendant City of Chicago and the Chicago Police Department of clandestinely using Stingrays without proper court authorization and falsely claiming that Stingrays are "pen registers."

170.     This pattern and practice violated the fourteenth amendment due process and fourth amendment rights of thousands of Chicago citizens, including Shawn Smith.

WHEREFORE , Shawn Smith  asks  this court for damages according to proof and for such other and further relief as this Court deems just.

## COUNT VI – INDEMINIFICATION
## (DEFENDANT CITY OF CHICAGO)

171.      Shawn Smith  realleges all previous paragraphs and incorporated them by reference.

172.     Illinois law provides that public entities, such as defendant City of Chicago are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

173.	At all relevant time, defendants Reyes, Brown, and Roney were agents of

defendant City of Chicago and of the Chicago Police Department acting within the

scope of their employment. Defendant City of Chicago, therefore, is liable as principal

for all torts committed by its agents, defendants Reyes, Brown, and Roney.


174.

## PRAYER FOR RELIEF

WHEREFORE, Shawn Smith requests this honorable court to grant Shawn Smith's

judgment against all defendants in a fair and just amount. Specifically Shawn Smith

prays for both compensatory and punitive damages against all defendants in addition to

costs and reasonable attorney's fees and all other relief as this court finds just and

reasonable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff Shawn Smith

demands trial by jury for all the issues pleaded.

Plaintiff,  Shawm Smith

/s/ Stephen L. Richards

By: Stephen L. Richards
53 West Jackson Suite 756
Chicago, IL 60604
773-817-6927
Sricha5461@aol.com
Attorney No: 6191946